## R. J. NITKEY v. JOSEPH A. WARD AND OTHERS.[1]

March 5, 1937.

No. 30,917.

*J. A. Mansfield* and *Harold Rogers,* for appellant.

*John W. Eckelberry* and *Junell, Driscoll, Fletcher, Dorsey & Barker,* for respondents.

HILTON, JUSTICE.

Appeal from a judgment entered in favor of defendants in an action brought by plaintiff for the purpose of having a certain deed, absolute on its face, given by him to the Guardian Securities Com-

[1]Reported in 271 N. W. 873.

pany, declared to be an equitable mortgage, void on the ground of usury, and for other relief.

The alleged claim of usury apparently is dropped on this appeal. No mention having been made of it in the briefs, it will not be considered. The lower court not only denied plaintiff the relief sought, but also held him liable on his guaranty to be personally responsible on a certain lease if there was default in the terms thereof, the facts of which will hereinafter be more fully discussed.

This litigation involved a tract of valuable improved real estate in the city of Minneapolis commonly known as the Security Building. It will be so referred to throughout this opinion. At the time the transactions out of which this litigation grew were consummated, the spring of 1928, plaintiff was and had been for five or six years a real estate dealer, speculator, and promoter having an office in the city of Chicago. In February, 1928, he came to Minneapolis and looked over several properties both in St. Paul and Minneapolis with the purpose in mind of purchasing. Correspondence was had with respect to the purchase of property other than the Security Building, but nothing ever came of it.

Plaintiff ascertained that the Security Building might be purchased from the Miami Corporation, the then owners, for the sum of $1,025,000. On April 25, 1928, he deposited in escrow with the Chicago Title and Trust Company $15,000 as earnest money for the purchase thereof. The next day he had a conference in Chicago with representatives of Westheimer & Company, a firm of investment bankers, relative to the sale of the property to them. No mention was made of a loan. The same day plaintiff engaged one F. J. Allen, who termed himself a "financial engineer," as his agent. For his services Allen was to be paid by plaintiff $75,000 cash. The conference with Westheimer & Company resulted in a contract by which the bankers agreed to purchase and the plaintiff agreed to sell for the sum of $930,000 the fee title to the Security Building, subject to a 99-year lease. It should be remembered that plaintiff at this time did not own the property but merely had made a small deposit of earnest money thereon. In a letter to Westheimer & Company evidencing the agreement between himself and

that firm, plaintiff stated that he proposed to acquire the fee simple title and after such acquisition "to convey the same to a corporate trustee, title to said property to be free, clear and unencumbered." This is important in view of what later transpired. In the same letter it was indicated that as part of the agreement the trustee was to lease the property to plaintiff for a long term and also to issue certificates representing fee ownership in the reversionary interest, said certificates to be sold to the general investing public. The plan incorporated in the letter was not carried out in exact detail, but was with practically the same result except for the interposing of several parties instead of the few first suggested.

May 4, 1928, plaintiff entered into a definite contract to purchase the Security Building, but payment therefor was not to be made until a later date, by which time plaintiff would have received the $930,000 from Westheimer & Company. As part of the plan plaintiff proposed to lease the property to the Minnesota Security Corporation, a Delaware corporation, of which plaintiff owned all the shares (1,000 shares) for a period of 99 years. May 21, 1928, plaintiff entered into a contract with Minton, Lampert & Company, investment bankers, whereby that firm agreed to purchase from plaintiff for $247,500 first mortgage bonds issued by the Minnesota Security Corporation to plaintiff, in the aggregate principal amount of $375,000, to be secured by the leasehold to be created at such time as plaintiff obtained title to the property, and second mortgage bonds in the principal amount of $100,000 to be likewise secured. The firm also was to receive 20 per cent of the capital stock of the Minnesota Security Corporation. One hundred thousand dollars remaining of the principal amount of second mortgage leasehold bonds was to remain with plaintiff.

Under the terms of the lease, to be made only after or at the time plaintiff acquired the title, the Minnesota Security Corporation was to pay an annual rental of $55,000 with an option granted to it to purchase the property at any time during the first 50 years of the term for the sum of $1,050,000. The lease was to run for 99 years. The lessee was to pay the taxes, an important consider-

ation for this particular transaction as will hereinafter be more fully pointed out, and to pay $7,500 yearly into a depreciation fund; said fund not to exceed $750,000. That fund was to be used as a credit should the lessee ever take advantage of the option to purchase, or as liquidated damages should there be default in any terms of the lease. All rental payments were to be made to the Guardian Securities Company, apparently as trustee for Westheimer & Company; the Guardian Securities Company also was to manage and control the depreciation fund. All this was brought about, so plaintiff claims, by a prior agreement, before Westheimer & Company would advance the $930,000 which plaintiff alleges to have been a loan and which that company claims was the price paid for the reversionary fee interest.

June 4, 1928, the entire "deal" was closed through the means of the Chicago Title and Trust Company acting as escrow agent. There was deposited with the escrowee by Westheimer & Company the $930,000; by Minton, Lampert & Company the $247,500 for the mortgage bonds and 20 per cent of the capital stock of the Minnesota Security Company. The escrowee already held the $15,000 earnest money of the plaintiff, apparently the only risk he took. The use of an escrow agent was essential, as plaintiff had no title to the property, nor was he able to acquire it until he paid the Miami Corporation the $1,025,000 purchase price. This he could not pay until he had realized some money from his own vendees. Thus there was to be in effect a simultaneous purchase and sale. The Miami Corporation deposited its deed to the property with the escrowee. The plaintiff, at the designation of Westheimer & Company, executed his warranty deed of the property to the Guardian Securities Company, subject to the 99-year lease, instead of to Westheimer & Company, the actual purchaser of the reversionary interest. The reason for this will subsequently appear.

The escrowee, after recording the various deeds, leases, etc., disbursed the money held by it, a total of $1,177,500 as follows: $1,025,000 to the Miami Corporation; the commission of $75,000 to F. J. Allen; $27,520 to an associate of the plaintiff; $6,666.66 to

plaintiff's own trust fund and for various other expenses. Plaintiff then had left a cash profit for himself, the $100,000 principal amount of leasehold bonds in the Minnesota Security Corporation, and a majority holding of the stock of the latter. This corporation at the time had $25,000 in cash and owned the leasehold estate, which was valuable then, for the net annual rental income of the property was much greater than that required to be paid by it under the terms of the lease.

Plaintiff's principal claim on this appeal is that the conveyance to the Guardian Securities Company, although in form an absolute conveyance, was in fact intended as a mortgage and should be so declared. The reason advanced for this claim was that the rentals to be paid by the Minnesota Security Corporation were to be made directly to the Guardian Securities Company, not to plaintiff; and also that plaintiff had given his personal guaranty that the rents would be paid, and warranted that the $7,500 would regularly be applied to the depreciation fund heretofore mentioned. Plaintiff seemingly contends that the $55,000 yearly rental was nothing but interest payments and the depreciation fund a reserve built up to reduce the principal amount of what he terms a loan, i. e., the $930,000 received from Westheimer & Company.

To clearly visualize the whole transaction it is necessary to explain why Westheimer & Company paid plaintiff almost as much for the mere reversionary interest as plaintiff himself paid for the entire fee. In Ohio a state constitutional provision required that all property, real or personal, be taxed at a uniform *ad valorem* rate. However, the ownership of the fee title to property located in another state, subject to a long-term lease requiring the lessee to pay the taxes (the situation here), was not subject either to a personal property or real estate tax in Ohio. For that reason such investments were desirable. However, as the average investor was unable to finance the purchase of valuable property so leased, the practice arose of having a trustee acquire the title thereto, and then to issue land trust certificates, each of which represented an undivided part in the legal or beneficial ownership of the property,

the type of the certificates depending on the state where the land was situated. These certificates then were sold in Ohio to the investing public, the trustee's duties being generally to manage the property, collect the rent, and distribute it pro rata to the holders of the certificates. That plan was followed here, as will hereinafter appear. Under an opinion of the attorney general of the state of Ohio, these certificates were not subject to *ad valorem* tax by that state if the lessee paid the real estate tax in the state in which the property was situate. Plaintiff was familiar with this type of transaction, as is evidenced by the fact that he had participated in one involving a property in Chicago. Because of the peculiar Ohio statute, Westheimer & Company was interested in the purchase of the property from plaintiff, for it then could make a profit for itself by the sale of such certificates.

To accomplish this plan, Westheimer & Company found it expedient to have plaintiff convey the reversion by warranty deed to the Guardian Securities Company, subject to the lease, which company in turn executed an agreement with one Joseph A. Ward, an officer thereof, and the lessee, the Minnesota Security Corporation, by which it transferred title to 999/1000 interests in the fee title to Ward, reserving to itself in connection with the 1/1000 interest retained by it the right to receive and disburse pro rata to the owners of the undivided fee the ground rental payable under the lease and further reserving to itself the right to hold and manage the depreciation reserve fund for the benefit of both the lessee and lessor as well as exercise the powers granted to the lessor to enforce the provisions of the lease. Ward then transferred the 999/1000 interests back to the Guardian Securities Company, subject to the terms on which he received them, which held those interests in fee for the benefit of Westheimer & Company. The latter sold for $940,000 ($10,000 more than the price paid for the full reversion) those interests in the form of certificates, each of which purported to represent 1/1000 interest in the reversion, to a syndicate composed of itself and the Guardian Trust Company, the latter being a holder of the controlling interest in the Guardian Securities Company.

The syndicate sold the certificates to dealers, most of whom were in Ohio, who in turn sold the same to the investing public. All of the parties concerned with the above transactions, including those finally holding the certificates, were made parties defendant to this action, a total of over 200.

It is admitted that the transaction took the form of an absolute sale and conveyance of the fee title subject to a lease with an option to purchase. In a situation such as this the court will look through the form of the transaction to determine its character, and even though the deed is absolute in form it will be regarded merely as a mortgage if the parties intended it only as security. Citizens Bank v. Meyer, 149 Minn. 94, 182 N. W. 913; Holton v. Meighen, 15 Minn. 50 (69). The problem resolves itself into a question of intention. That is the true test. See King v. McCarthy, 50 Minn. 222, 52 N. W. 648; Westberg v. Wilson, 185 Minn. 307, 241 N. W. 315; Lundeen v. Nyborg, 161 Minn. 391, 201 N. W. 623. A matter of intention is entirely one of fact to be determined by the trial court, and a finding by it in this regard will not be set aside unless it is clearly or manifestly against the weight of the evidence. Sommers v. City of St. Paul, 183 Minn. 545, 237 N. W. 427; C. L. Coleman Lbr. Co. v. Mironowski, 174 Minn. 507, 219 N. W. 758; Hartigan v. Norwich Union Indemnity Co. 188 Minn. 48, 246 N. W. 477. So a finding that a deed absolute in form is not an equitable mortgage will be sustained unless it is palpably without support in the evidence. Young v. Baker, 128 Minn. 398, 151 N. W. 132; Dod v. Investment Certificate Co. 195 Minn. 254, 262 N. W. 683. The presumption is that such a deed was intended as an absolute conveyance of the fee, and the burden is on the party asserting otherwise to prove it. A finding of the trial court either way will not be disturbed even where there is strong evidence to the contrary. Merchants Nat. Bank v. Stanton, 62 Minn. 204, 64 N. W. 390; see First Nat. Bank v. Coon, 143 Minn. 262, 173 N. W. 431.

Here the evidence amply supports the finding of the trial court. In a letter to Westheimer & Company confirming the arrangement agreed upon in the Chicago conference on April 26, 1928, the plain-

tiff expressly stated that Westheimer & Company were obligated to "purchase" the fee and that after he (plaintiff) acquired it he proposed to "convey" the same to a corporate trustee. At the same time plaintiff agreed to have the fee simple title to said premises insured in the trustee. This he did and paid the premium therefor. Surely had not plaintiff intended that the transaction was to be an absolute conveyance he would not have done these various things. Further, he furnished the opinions of several attorneys that the certificates which were to be issued represented undivided interests in real estate under the laws of Minnesota. Such actions were not those of a mortgagor. The circumstance that the lessee could purchase the premises at any time within 50 years is not necessarily indicative of a security transaction. There is no intimation that the rental agreed to be paid, $55,000, was intended as interest; that being true, there is no right to hold that it was. See Bigler v. Jack, 114 Iowa, 667, 87 N. W. 700. In Rugg v. Atcherly, 22 Ohio Dec. 100, it was held that a deed will not be regarded as a mortgage even if the property was leased back to the grantor with the privilege of purchase if the circumstances surrounding the transaction indicate a belief on the part of the grantee that it was a bona fide transfer. Here it is unnecessary to go that far, for the lease ran to a third party, the 'Minnesota Security Corporation, and not to the grantor, the plaintiff.

The reserve set up for the depreciation is not conclusive that the conveyance was intended as a mortgage under the facts here disclosed. The fund was to protect the lessor in case of default on the part of the lessee in the terms and conditions of the lease and was to be used as a credit should the lessee take advantage of the option to purchase the property. In reality it protected both parties. Further, it was not such a large sum as to be out of reason with the probable actual depreciation of the building, considering its value and size.

Neither that fund nor the option imposed any obligation to repurchase. It was entirely a matter of choice with the lessee. Neither were they any evidence of a preëxisting indebtedness between

any of the parties to the transaction. That is a strong circumstance tending to prove that the conveyance was what it purported to be (see Dixon v. Wright, 175 Miss. 191, 166 So. 374), for the absence of a personal obligation very materially affects the determination as to whether an absolute conveyance was intended. See Lundeen v. Nyborg, 161 Minn. 391, 201 N. W. 623. The lower court found that the property was worth, in 1928, just about what plaintiff paid the Miami Corporation for it. That finding is well supported. The price actually paid is the strongest kind of evidence of its value. Considering that, it would be unreasonable to suppose that Westheimer & Company would have been willing to loan an amount equal almost to the value of the property as plaintiff insists. See Bigler v. Jack, 114 Iowa, 667, 87 N. W. 700.

The rule is absolute that in a transaction of this nature the intention of the parties is to be ascertained by the written memorials of the transaction and all the attendant facts and circumstances. Citizens Bank v. Meyer, 149 Minn. 94, 182 N. W. 913; see Dennis v. Swanson, 176 Minn. 267, 223 N. W. 288; Roehrs v. Thompson, 179 Minn. 73, 228 N. W. 340. The documents make a *prima facie* case for what they purport to be. Westberg v. Wilson, 185 Minn. 307, 241 N. W. 315; Citizens Bank v. Meyer, 149 Minn. 94, 182 N. W. 913. Here they were in the form of an absolute conveyance.

Plaintiff testified that at the time the transaction was entered into he intended to make a loan and that he thought such was the purpose of the parties with whom he dealt. The lower court was warranted in discounting his testimony. In the verified pleadings he alleged that Allen was not his agent. At the trial it was definitely proved that he was. Without question plaintiff was familiar with this type of transaction. He knew the difference between a sale and a loan, a mortgage and an absolute conveyance, a deed and a leasehold.

Plaintiff was the only witness to actually support his theory. The court had a right to reject his testimony. See Minneapolis H. Co. v. Landers-Morrison-Christenson Co. 141 Minn. 127, 169 N. W. 534. This is not a case where a person having owned property for some

time sought a loan because of a temporary financial difficulty and conveyed his property as security; rather it appears from all the evidence that plaintiff was a speculator having no intrinsic interest in the ownership of the property except as a promoter with but one thought in mind, *i. e.*, to make a quick profit and get out. Every contract made by plaintiff was with respect to property he never before owned. His principal object was to make a simultaneous sale and thereby obtain a profit. On the record here the conveyance cannot be regarded as a mortgage. See Stark v. Bauer Cooperage Co. (C. C. A.) 3 F. (2d) 214.

The intention of plaintiff can easily be ascertained from his actions at and subsequent to the purchase and sale of this property. At no time during the transactions was any reference ever made specifically to a loan, mortgage, or security transaction. This despite the fact that plaintiff knew the meaning of the various terms. In regard to other similar transactions had by him, he always termed his conveyance of the property as an absolute sale. He so represented to those dealing with him. A circular approved by him, obviously to be used to interest the general investing public in buying, advised that the certificates, of which mention has been made heretofore, represented an interest in real estate in Minnesota. Hundreds of investors, many of whom are the defendants here, bought the certificates relying on these representations. Plaintiff now has the temerity to adopt a contrary position.

In other ways plaintiff indicated that an absolute conveyance was intended. In various letters he referred to the "sale" of the land and stated that the Guardian Securities Company would "take title to the fee"; also that the transaction was a "purchase" by Westheimer & Company. Even his attorney admitted in some of his correspondence that the plaintiff had "sold" the fee simple title.

Aside from plaintiff's own viewpoint, before a court will hold a deed absolute on its face to be an equitable mortgage it must appear that both parties so intended. Westberg v. Wilson, 185 Minn. 307, 241 N. W. 315. Assuming that plaintiff himself actually thought and intended to enter into a mortgage agreement, even then it would not necessarily follow that he would be entitled to the relief he

seeks.  The other parties quite obviously did not intend a mortgage. The certificates purporting to be an interest in real estate were generally known to the investing public as representing just that. This of course would be inconsistent with a mortgage relationship. Investors in Ohio particularly bought them because they did represent such an interest, for thereby they were relieved of some of their tax burden.  That fact is well illustrated by the circumstance that in the University of Cincinnati Law Review (1928) 255, 257, the statement was made that the holder of similar certificates was in no sense a creditor but rather was "part owner of the real estate." Witnesses testified that such was the general understanding at the time.  Plaintiff, because of his familiarity with these certificates, must have been aware of that fact.

Without going fully into the testimony and evidence, suffice it to say that all of the representatives who acted for the various firms of bankers, trust, and title companies at the time the transactions were consummated (1928) were unanimous in agreeing that a loan was never intended or even discussed at any time.  The court was fully warranted in relying upon this testimony.

Fundamentally, as pointed out heretofore, questions of this nature primarily involve a matter of intention.  Therefore, resort to cases construing instruments of this nature is not of much help.  The attorney general of Ohio in an opinion of September 22, 1926, ruled that certificates such as used here represented an interest in real estate; it was also so held in Senior v. Braden, 295 U. S. 422, 55 S. Ct. 800, 79 L. ed. 1520, 100 A. L. R. 794, reversing 128 Ohio St. 597, 193 N. E. 614; and in City Nat. Bank Bldg. Co. v. Commissioner of Internal Revenue, 34 B. T. A. 93; whereas Commissioner of Internal Revenue v. H. F. Neighbors R. Co. 81 F. (2d) 173, contains language to the contrary.  Here the trial court found that the intention of the parties was to make an absolute sale and conveyance.  The documents were *prima facie* evidence thereof.  In order to justify a decree that a deed absolute on its face is a mortgage "there must be something more than a mere preponderance of the evidence to support that view.  The proof must be clear, strong,

and convincing." See Durgin v. Stevenson, 192 Minn. 526, 529, 257 N. W. 338; Townsend v. Anderson, 163 Minn. 518, 204 N. W. 330. Plaintiff's proof was neither clear nor strong and fell far short of being convincing. Considering that the trial court must be sustained unless its findings are clearly and manifestly contrary to the evidence, Young v. Baker, 128 Minn. 398, 151 N. W. 132; Minneapolis H. Co. v. Landers-Morrison-Christenson Co. 141 Minn. 127, 169 N. W. 534, there is no alternative but to affirm, in all respects, the judgment appealed from.

Affirmed.

MR. CHIEF JUSTICE GALLAGHER and MR. JUSTICE PETERSON, not having been members of the court when this case was argued and submitted, took no part in its consideration or decision.

MR. JUSTICE STONE took no part in the consideration or decision of this case.